STEEL *against* THOMPSON.

The Landlord and tenant act was only intended to be applied to the plain and ordinary case of a demise at a certain rent, and a tenancy, whose termination, is independent of a contingency. If therefore it appears upon the trial of a cause, originating under this act, before two Justices, from whose jurisdiction it was removed to the Common Pleas, by the affidavit of the party, that it was not such a case as that act intended to provide for, it will be fatal to the proceeding.
The rule of policy, which protects a husband from the admissions of his wife, is inapplicable to such as are in the nature of *facts* in respect to which, the presumptions to which they give rise, are not drawn from the credit of the party, but the fact that such admissions were actually made. In a case, therefore, where the husband is sought for at his own house, for the purpose of making a tender to him, and his wife refuses to give information where he may be found, and declares that her husband will not except the tender, such declarations may be given in evidence.

Error to the court of Common Pleas of *Westmoreland* county. This was a complaint made before two Justices of the Peace by the plaintiff in error under the *Landlord and tenant law;* and upon the defendant in error making the oath required by the act of

(Steel *v.* Thompson.)

Assembly was removed into the Common Pleas. It appeared in evidence that a certain *William Lyons* by his deed dated the 8th June, 1824, conveyed the land in controversy to *William Thompson,* the defendant in error, in fee simple. The consideration mentioned in the deed is the sum of $1000---and that *William Thompson* should pay the said *Lyons* the sum of $60 per year during the life of said *Lyons,* and maintain his daughter. There is no receipt annexed to the deed for the sum of $1000. The deed refers to an article of agreement between the same parties of the same date, (8th June, 1824,) in which *Thompson* covenanted to pay the said *Lyons* $60 per year, during the life of the latter, and maintain *Sarah Lyons* his daughter; and in consideration thereof the said *Lyons* agreed to convey to *Thompson* the premises now in controversy. For the first instalment of $60 that became due under this agreement the cattle of *Thompson* the defendant in error, were sold under an execution. For the second instalment of $60 according to the said agreement, a judgment was obtained; the land in controversy was levied and sold to *William Lyons* the plaintiff, on the 22d February, 1827, for the sum of twenty dollars. On the 14th March, 1827, *Joseph Steel* executed his bond with warrant of attorney for confessing judgment to *William Lyons* in the penal sum of $2500, conditioned for the payment of $60 annually on the 8th June of each year, to the said *Lyons,* during his natural life and maintaining his daughter *Sarah Lyons.* On the same day, 14th March, 1827, the parties to the present case entered into an agreement as follows: "It is agreed between *Joseph Steele* and *William Thompson*—that the said *William Thompson* is to keep and maintain *Sarah Lyons* according to the terms of *Steele's* bond to *William Lyons* of this date, for two years from the first of April next, in consideration of which, said *Thompson* is to enjoy the place he now lives on for two years from the first of April next, as a *tenant,* unless within that time said *Thompson* pays said *Steele* for the advances made *William Lyons* on account of *Thompson's* contract with said *Lyons* concerning said place, with interest and a reasonable allowance for expenses—during said term of two years, *Thompson* is to give *Steele* one half of the hay raised on the said place, and to pay all taxes and to make two fences, one on each side of the meadow, to save the grass, the hay to be delivered in the mean time; and if at the end of the two years or before *Thompson* is able to refund to *Steele* as above—in that case *Steele* agrees to reconvey to said *Thompson.*" To this is subjoined a *nota bene* of same date, under seal, with the signatures of the parties, in which it is stipulated, that if *Sarah Lyons* should not be maintained according to contract, and should make complaint on this subject, that the agreement was to be at an end. On the 19th March 1827, judgment was confessed on the penal bond from

*Steele* to *Lyons* before mentioned. The sheriff made a deed to *Lyons* for the said premises on the 9th July, 1827. *Lyons* conveyed to *Steele* in fee simple by deed, dated 23d August, 1827. *Steele* gave *Thompson* notice to quit the said premises on the 30th December, 1828 and required him to deliver possession on the 1st April then next following. *Steele* made complaint on oath before two Justices of the Peace the 10th April, 1829, under the *Landlord and Tenant* act, and they issued their precept to the sheriff commanding him to summon a jury, &c. On the 18th day of same month, *Thompson* made oath (this being the return day of the precept) that he claimed the premises adversely to *Steele*, and that he had leased the premises from *Steele* on an engagement in the nature of a mortgage to secure *Steele* for any moneys that he might have paid *Lyons* by reason of the contract, referred to in said lease or mortgage—and further, that he was always willing and ready, and offered to comply with his agreement. *Jacob Haymaker* Esq. a witness on the same side, deposed that a neighbor of his wanted to buy the tract of land from *Thompson* in March, 1829 — he could not tell the day. Witness said to *Steele*, there is an article between you and *Thompson*—*Steele* said he would never give it up, and whoever would buy it, would buy a law-suit. Afterwards, *Thompson* told the witness that *Steele* was willing to give up the land if he would get his money, and that he *(Thompson)* wished *Steele* to acknowledge it in the presence of a witness. *Thompson*, *M'Ilroy* and witness went to *Steele's*—as they approached *Steele's* house witness saw a man leaning on the window, whom he took to be *Steele*. They went into the house and inquired for *Steele*— his son said he had gone up the lane—*M'Ilroy* wished his son to send for him. *M'Ilroy* said that if notes would not do he would get silver, as he understood that *Steele* would take nothing else, *M'Ilroy* had no money with him. He waited till 9 o'clock at night and then went home. This was before the 1st April, 1829. The counsel for the defendant then offered in evidence the deposition of *Joseph Hunter* taken under a rule of court. The counsel for the complainant objected to that part of it that relates to the conversation of Mrs. *Steele*. The Court over-ruled the objection, and admitted the evidence—to which the counsel for the complainant excepted. The witness says that on the first April, 1829, *Thompson* asked deponent to go with him and see a tender made of certain money to be paid to *Steele*—deponent went in company with *Thompson* and *Neal Boyle* on said day to *Steele's* house, "and made inquiry at Mrs. *Steele's* concerning where said *Steele* was, to which she answered that he had not been at home for some days: said *Wm. Thompson* then told Mrs. *Steele* that he was come with the intention of paying certain moneys in conformity to,

(Steele *v.* Thompson.)

an agreement entered into between him and *Steele.* Mrs. *Steele* then made answer, that it was not worth his while to offer any money for it would not be accepted of, as they intended to keep the land because they had already had considerable trouble with it. Deponent further said, that he had $300 in Pittsburgh notes ready to pay to *Steele* for said *Thompson*---that after the refusal of Mrs. *Steele* to take the money or to tell where *Steele* was, they left the house.

The Court below, (Young President,) was of opinion, and so instructed the jury, that the plaintiff could not maintain the action. A verdict and judgment was rendered accordingly. The following errors were assigned:

1. The Court below erred in admitting the evidence noted in the bill of exceptions.

2. The Court erred in charging the jury, that the agreement between the parties of the 14th March, 1827 was not a lease.

3. In charging the Jury that Mrs. *Steele* was the representative of her husband in his absence, and that as no objection was made by her to the alleged tender of bank notes, the tender was good.

4. In charging the jury that the defendent had substantially complied with his contract.

5. In charging the jury, that even if the defendant had not complied with his contract, the plaintiff was premature in his proceedings to enforce the performance of it.

6. In charging the jury that the law and the evidence were with the defendant.

*J. Findlay* and *Foster*, for plaintiff in error.

*Armstrong* and *J. B. Alexander*, for defendant in error.

The opinion of the court was delivered by

GIBSON, C. J.--The tenant may suspend the proceedings before the justices and freeholders, in order to have the judgment of the Common Pleas on a question whether the landlord has not parted with his reversionary right to the possession by deed, will, or descent, *since* the demise.  Here the suspension was on an allegation that the tenant himself had acquired the inheritance, and with it, the incidental right to the possession, by what is alleged to be equivalent to the performance of a condition reserved *in* the demise; and however consonant to the spirit of the provision this may have been, it was certainly not warranted by the letter.  Still I am not prepared to say that the reference to the Common Pleas ought not to have been sustained.  At all events, there was no motion to remit the proceedings to the inferior tribunal, and the cause was put to the jury with a direction in which we concur, that the lease was not such as to give the justices and freeholders jurisdiction.  The

(Steele *v.* Thompson.)

truth of this will, I think, appear from the context of the act, which seems to indicate that the legislature had in view a proceeding that should involve nothing but the most simple and obvious matters of fact.   The cardinal points of precedent possession, leasing at a certain rent, holding over, and notice to quit, are not, in the usual mode of their occurrence, above the capacity of men of ordinary acquirements; and being attended with no difficulty of principle or intricacy of circumstances, it was not thought necessary to bring to their solution the powers of a jury directed by judges learned in the law.   On the other hand, the question whether the landlord had not parted with the reversion, as it might involve the legal construction of the instrument or the laws of descent, was for its difficulty reserved to the ordinary tribunals.   But it is obvious that the construction of a doubtful agreement, in respect of the nature and extent of the tenant's interest, may present points of equal difficulty; and we can account for the absence of a provision to reserve that also, only by supposing that there was no design to extend the remedy to such a case.   The same reason that would require it to be restrained to the case of a demise at a certain rent, would equally require it to be restrained to a tenancy whose termination is independent of a contingency; and that it was intended for plain and ordinary cases, is indicated by peculiar expressions in the act itself, which requires that it appear to the justices that the landlord had been "*quietly* and *peaceably* possessed;" that he had demised "at a *certain rent;*" and for a term "*fully* ended;" from all which it should incontestibly appear that the relation of landlord and tenant existed at the time of the application to the justices.   Here the relation of the parties was contingent, if not doubtful, from the beginning; and when application was made to the justices, it was not easy, as it appeared at the trial, to determine its nature or extent.   If to ascertain whether the landlord has not parted with the reversion by deed, will, or descent, be so difficult in the estimation of the legislature as to demand the judgment of the Common Pleas, it is certainly no less difficult to ascertain whether the tenant has not acquired it pursuant to a condition in the lease, the determination of which involves the adjustment of a complicated account, and a consideration of the whole law of tender as equivalent to actual performance.   The judge, therefore, was entirely accurate in saying that the contract had "more the aspect of one for the disposal of an interest in land on specified terms, than of a lease by the actual proprietor to his tenant at a stipulated rent."   Beside, not only was the plaintiff destitute, of that quiet and peaceable possession which the law requires, at the date of the lease, but he was without even the color or pretence of a right to it; and that alone would be fatal to his right to recover by this summary proceeding.   As, then, an objec-

(Steele *v.* Thompson.)

tion to jurisdiction is always in time, the nature of the contract was properly put to the jury as an impassable bar.

Such, then, being the state of the principal question, the remaining errors might be deemed immaterial, even had they been sustained by the argument.   But the declaration of the plaintiff's wife was properly admitted.   Slight evidence had been given of his reluctance to part with the title, and of his having kept himself out of the way of an expected attempt by the defendant to tender the purchase-money.   To show an attempt actually made, it was competent to the defendant to prove, as he did, that he had called for the purpose at the plaintiff's house, and was informed of his absence by his wife, who, by universal custom, is the representative of her husband, so far as to answer the calls of those who have transactions with him, and to convey to him the nature of their business, or inform them where he may be found.   So far the competency of her declarations will not be disputed.   But on every principle of analogy, he is to be affected by all acts done, or declarations made by her, within the scope of this customary authority.   In a matter pertaining to the domestic economy, as this certainly was, he is chargeable with her acts on a presumption from the very nature of her functions, that she has acted by his authority and with his assent.   From the naked fact of cohabitation, arises a presumption not only of an authority to purchase necessaries for the family, but also of their having come to the husband's use; and this rule has no other foundation than the general current of family transactions.   But these declarations were admissible in another point of view.   The rule of policy, which protects the husband from the admissions of his wife, is inapplicable to such as are in the nature of FACTS; in respect to which, the presumptions to which they give rise, are not drawn from the credit of the party, but the fact that such admissions were actually made. *Starkie Ev. pt.* iv. 712; and on this principle it seems that declarations by a wife of the state of her health at the time of effecting insurance on her life, may be given in evidence against her husband in an action on the policy.   Now, to advert to the nature of the declarations here:   The defendant, in seeking for the plaintiff at the place of his residence, is told by his wife that he has been absent from home several days.   He declares that the object of the visit is to pay certain moneys due to her husband as the price of this land; and in reply, she neither proposes to inform him of the matter, nor, as she would naturally have done, had her answer not been prepared, directs the defendant where to find him; but remarks, that it is not worth the defendant's while to offer money, as it would not be accepted, because they intend to keep the land, having already had considerable trouble with it.   On the principle indicated, then, this declaration was a substantive part of the trans-

(Steele *v.* Thompson.)

action from which the jury might draw their own conclusion. Why should they not? The fact that a declaration which precluded further inquiry, was made by one whose office it would otherwise have been to furnish the means of access to her husband, is full of information in respect to the motive of his absence.

To obviate the objection that the money intended to be tendered, was in bank notes, it is sufficient that the defendant was prepared to convert the notes into coin; and having done all that depended on himself to effect a performance of the condition, the judge was warranted in the opinion he expressed, leaving the evidence to the jury, that the law and the fact were in his favor. Nor is there error in the direction that the proceeding was in any event premature. The plaintiff was bound to exhibit an account of moneys advanced and expenses incurred, before he could call on the defendant, who would otherwise not know what to tender; and in default of it, equity would not only restrain the plaintiff from recovering the land, but compel him to execute the contract on an offer to pay whatever should be due.

Judgment affirmed.